The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts as those reached by the Deputy Commissioner, with some modification but modifies the conclusions and holding of the Deputy Commissioner. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
The Full Commissioner finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Order, at the hearing and after the hearing as
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. No parties appear in a representative capacity.
4. An employer-employee relationship as defined by N.C. Gen. Stat. § 97-2(2) existed between the parties on December 8, 1994.
5. Defendant-employer was insured by Travelers on December 8, 1994.
6. Plaintiff's average weekly wage at the relevant time was $326.40, yielding a compensation rate of $217.61.
7. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
8. The parties, through counsel, stipulated a packet of unlabeled and unindexed medical records into evidence without the need for further authentication or verification.
9. The parties, through counsel, stipulated wage records from plaintiff's employment with Winn Dixie into evidence without the need for further authentication or verification.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a thirty-one year old female with a tenth grade education who had obtained an GED. Plaintiff initially developed carpal tunnel syndrome while she was employed at Sears. Plaintiff underwent a carpal tunnel release on her right hand on September 1, 1992 performed by Dr. Phillip Carter in Greensboro, North Carolina.
2. Plaintiff returned to work for Sears after her surgery and performed light duty inventory work. During that time she continued to have problems with her right wrist and continued to see a number of doctors seeking relief for her right wrist problems.
3. Although plaintiff was not doing any repetitive work in 1993, her symptoms worsened.
4. Plaintiff was ultimately referred to Dr. Stovall King, a neurosurgeon, on January 4, 1994 while she was still employed by Sears. Dr. King did a nerve conduction study and ultimately performed a second right carpal tunnel release on plaintiff on January 20, 1994. On February 10, 1994, plaintiff was released from Dr. King's care with a five percent permanent partial disability of the hand as a result of showing no signs of her carpal tunnel syndrome. After plaintiff's January 1994 right carpal tunnel release, plaintiff did not return to work with Sears. Plaintiff entered into a Compromise Settlement Agreement with Sears which resolved and closed her claim against that employer.
5. On May 16, 1994, plaintiff began working with defendant-employer AMP, Incorporated. Prior to her employment and as a part of her employment application, plaintiff indicated on the Employee Health Questionnaire that she had carpal tunnel syndrome in August of 1992, had surgery and that the problem was corrected.
6. Plaintiff also spoke with Ms. June Hartsell, an employee and representative of defendant-employer and told her that her wrists were fine and gave her medical information including the name, address and telephone number of Dr. King. As a result of this communication, Ms. Hartsell spoke with Dr. King over the phone, and Dr. King sent Ms. Hartsell a facsimile regarding plaintiff's condition and ability to perform certain job duties. The plaintiff also provided Ms. Hartsell a form completed by Dr. King. This form was generated by the defendant-employer indicating that it was a job analysis of the physical requirements for Brenda McNeil in the job of connector assembler which would involve operating a variety of hand activated, semi-automatic and automatic assembly machines and/or performing hand assembly, also performing inspection, packaging and other related duties. On this form, defendant-employer had indicated that this job would require reaching, grasping and performing repetitive movement "occasionally" which was characterized as "one to three hours in an eight hour work day." Dr. King approved plaintiff for this job on May 9, 1994.
7. Although defendant-employer argues that plaintiff misrepresented her medical condition to defendant-employer, it is clear that before she was employed by defendant-employer, plaintiff disclosed her history of carpal tunnel surgery and provided the name, address and telephone number of her doctor who had treated her for that surgery. Indeed, defendant-employer's representative had spoken with that doctor personally. At that time, any additional inquiry as to plaintiff's condition could have been made or medical records could have been ordered as defendant-employer has argued it would not have hired plaintiff had it been aware of her prior two carpal tunnel surgeries. Defendant-employer's policy on obtaining information regarding a prior medical problem required sending the aforementioned job analysis form but not requesting or reviewing medical records. Defendant-employer suffered no prejudice as a result of plaintiff's failure to list her most recent carpal tunnel surgery.
8. Plaintiff became employed with defendant-employer on May 16, 1994. In June, July, August and September 1994 plaintiff was employed at defendant-employer's Burgess Road facility as a connector assembler. On October 19, 1994, plaintiff was transferred from defendant-employer's Burgess Road facility which had closed its American Avenue facility. While at the Burgess Road facility, plaintiff worked as an assembly connector which involved a variety of jobs. During her performance of that job she did not have any problems with her wrists. This was the job for which defendant-employer sought and obtained approval from Dr. King. When plaintiff was transferred to the defendant-employer's American Avenue facility she was placed on the VCI machine. Plaintiff's job running the VCI machine was a production type position. Plaintiff's job duties on the VCI machine involved placing two thousand housings in a case per night. Plaintiff's doctors did not have the opportunity to review this job description before the plaintiff was assigned to this new work station.
9. One night in December 1994, plaintiff became physically unable to pick up any housings. Her forearms started swelling and her hands were cracked and bleeding. Plaintiff reported this problem to her group leader, Charles Walker. Plaintiff did not return to her machine that night, but she did remain at work.
10. On December 8, 1994, plaintiff returned to Dr. King indicating that she had returned to production line work and was experiencing a recurrence of carpal tunnel syndrome in her right wrist and developing similar symptoms in her left.
11. Plaintiff continued to work on the VCI machine until she returned to Dr. King on March 14, 1995 indicating that her left hand was swollen and she could not turn her right hand. At that time, Dr. King gave her a note indicating that she should remain out of work and could not perform any repetitive work.
12. On September 28, 1995, Dr. King performed a recurrent right carpal tunnel release on plaintiff. On November 9, 1995, plaintiff underwent a left carpal tunnel release also performed by Dr. King.
13. On January 4, 1996, plaintiff was last seen by Dr. King who released her to return to work on February 9, 1996 with the restrictions of not performing any jobs which required repetitive motion with her wrists.
14. Plaintiff was released to return to a non-repetitive job with a five percent permanent partial disability rating to each hand.
15. At the time of the hearing before the Deputy Commissioner, plaintiff was employed at a Winn Dixie grocery store earning less than she had with her employment with defendant-employer. Plaintiff first became employed with Winn Dixie in the week ending February 28, 1996 and worked up through the time of the hearing before the Deputy Commissioner at a rate of $5.00 per hour.
16. There is insufficient evidence of record from which to determine by its greater weight that plaintiff's employment with defendant-employer placed her at an increased risk of developing left carpal tunnel syndrome than members of the general public not so employed.
17. There is insufficient evidence of record to determine by its greater weight that plaintiff had an occupational disease in her left hand which was caused by her employment with defendant-employer.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The employer in whose employment plaintiff was last injuriously exposed to the hazards of the occupational disease shall be liable. N.C. Gen. Stat. § 97-57. Plaintiff was last injuriously exposed to the hazards of repetitive motion which caused a recurrence of the compensable occupational disease of right carpal tunnel syndrome during her period of employment with defendant-employer. Rutledge v. Tultex Corp.,308 N.C. 85, 301 S.E.2d 359 (1983).
2. As the result of the right carpal tunnel syndrome, plaintiff was disabled from work and entitled to receive temporary total disability compensation at the rate of $217.61 per week from March 14, 1995, until she returned to work on February 28, 1996. N.C. Gen. Stat. § 97-29.
3. As the result of the right carpal tunnel syndrome, plaintiff was temporarily partially disabled from work and is entitled to receive compensation at the rate of two-thirds (2/3) of the difference between her average weekly wage of $326.40 and her wages earned thereafter, commencing on March 1, 1996, and continuing up to the statutory limit of 300 weeks. N.C. Gen. Stat. § 97-30.
4. Plaintiff is entitled to payment of all medical expenses by defendants incurred or to be incurred as a result of plaintiff's compensable right carpal tunnel syndrome. N.C. Gen. Stat. § 97-25.
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $217.61 per week for the period from March 14, 1995, until February 28, 1996. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee approved below.
2. Defendants shall pay plaintiff temporary partial disability compensation beginning March 1, 1996, and continuing up to 300 weeks, at the rate of two-thirds (2/3) of the difference between her average weekly wage of $326.40 and the wages which she is able to earn thereafter. Any compensation that has accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as the result of her compensable occupational disease, when bills for the same have been submitted and approved by the Industrial Commission. The approved medical expenses do not include treatment for the left carpal tunnel syndrome, which is not causally related to the employment with defendant-employer.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under paragraphs one and two of this Award is approved for plaintiff's counsel and shall be deducted from the sum due plaintiff and paid as follows: twenty-five percent (25%) of the lump sum due plaintiff under paragraphs one and two of this Award shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs due this Commission.
This the __________ day of March 1998.
 S/ ______________ LAURA K. MAVRETIC COMMISSIONER
CONCURRING:
S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
S/ __________________ THERESA B. STEPHENSON COMMISSIONER
LKM/jth